## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Shannon P. Evans,

        Plaintiff,

v.

Carolyn W. Colvin,
Acting Commissioner of Social Security,

        Defendant.

Case No. 14-cv-1011 (JRT/TNL)

**REPORT &
RECOMMENDATION**

Shannon P. Evans, Apt. A, 200 North Mill Street, Rushford, MN 55971 (pro se Plaintiff); and

Ana H. Voss (on brief) and Pamela Marentette, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

Plaintiff Shannon P. Evans brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1382. This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (Docket No. 11) and Defendant's Motion for Summary Judgment (Docket No. 14). These motions have been referred to the undersigned for a report and recommendation to the district court, the

Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 11) be **DENIED** and Defendant's Motion for Summary Judgment (Docket No. 14) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, asserting that he has been disabled since March 8, 2012,[1] due to back and knee injuries. (Tr. 52, 54, 65; *see* Tr. 132-35.) Plaintiff's applications were denied initially, and again upon reconsideration. (Tr. 52, 54, 56, 58, 60-62, 72-73, 76-77.) Plaintiff appealed the reconsideration determination by requesting a hearing before an ALJ. (Tr. 80-81; *see* 83-86.)

The ALJ held a hearing on February 21, 2013. (Tr. 13, 32; *see also* Tr. 97-118, 124-27.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review. (Tr. 1-3, 9; *see* Tr. 219-22.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) Plaintiff moved for summary judgment on August 11, 2014 (ECF No. 11), and the Commissioner filed a cross motion for summary judgment on September 25, 2014 (ECF No. 14). This matter is now fully briefed and ready for a determination on the papers.

---

[1] While Plaintiff filed his applications on August 10, 2011, alleging an initial onset date of June 1, 2011, (Tr. 13, 52, 54, 132), the onset date was subsequently amended (Tr. 13, 36). At the hearing before the administrative law judge ("ALJ"), Plaintiff amended his alleged onset date to March 9, 2012. (Tr. 36-37.) The ALJ, however, used March 8, 2012, the date Plaintiff stopped working. (Tr. 13, 15, 21, 36-37.)

# III. RELEVANT MEDICAL HISTORY

Plaintiff challenges only the ALJ's findings and decision relating to his physical impairments and associated symptoms. Accordingly, the Court focuses on the records relevant to these impairments.

## A. 2010

In August 2010, Plaintiff was seen by Wayne G. Kelly, M.D., with complaints of left knee pain. (Tr. 293.) Plaintiff stated that, approximately one week before, "he felt a sudden popping sensation in his left knee" when trying to get up from a recliner and has had pain since then. (Tr. 293.) Plaintiff's "left knee is now showing some clicking and seems to give out at times." (Tr. 293.) Dr. Kelly noted that Plaintiff had "a history of knee injury to his right knee." (Tr. 293.)

Dr. Kelly observed that Plaintiff

> is an alert, well-developed, middle-aged . . . male in no distress. His left knee shows that he has minimal effusion present. Range of motion is fairly good. He is nontender over the joint space. The collateral and cruciate ligaments appear to be stable. McMurray's testing is negative.

(Tr. 293.) Dr. Kelly diagnosed Plaintiff with an "acute strain" in his left knee and recommended Plaintiff "wait a couple of weeks and treat symptomatically." (Tr. 293.) Dr. Kelly instructed Plaintiff to ice his knee and gave him a prescription for Tramadol to treat the pain. (Tr. 293.) Dr. Kelly noted that he "[m]ight consider an MRI scan if [Plaintiff] does not improve." (Tr. 293.)

In September, Plaintiff saw Rebecca Lossen, M.D., for a physical. (Tr. 305.) Dr. Lossen noted that Plaintiff had surgery on his right knee in 2008. (Tr. 305.) Plaintiff

reported that he "exercises regularly," but "is very concerned about his weight as it seems to continue to climb." (Tr. 305.) Plaintiff stated that "[h]e does not get out as much as he would like but would like to do more." (Tr. 305.)

Plaintiff reported "some knee pain" and back pain. (Tr. 305.) Plaintiff reported that

> [h]is back is hurting so much that he can't stand or sit for long periods of time. If he sits for too long he has [to] get up and stand, if he stands for too long then he has to sit down. He spends most of his time playing video games and working on the computer. He says that he is trying to get a business going on the computer.

(Tr. 305.)

Dr. Lossen observed that Plaintiff "is clean, well kept[, o]bese," and "no CVA or spinal tenderness." (Tr. 305, 306.) Dr. Lossen prescribed cyclobenzaprine[2] for Plaintiff's back pain and diclofenac. (Tr. 306.) Dr. Lossen also instructed Plaintiff to "[w]atch his food intake" and "strongly encouraged [him] to get up and move more often and not spend so much time in front of the computer." (Tr. 306.)

Plaintiff saw Dr. Lossen again in October with, among other things, complaints of back pain. (Tr. 295.) Plaintiff's back had been "spasming quite a bit" and the muscle relaxer he had been prescribed, cyclobenzaprine, was not helping. (Tr. 295.) Upon physical examination, Dr. Lossen noted that, "[e]very now and then[, Plaintiff] has what appears to be shooting pain into his back causing him to straighten up significantly." (Tr.

---

[2] "Cyclobenzaprine is used to help relax certain muscles in your body. It helps relieve the pain, stiffness, and discomfort caused by strains, sprains, or injuries to your muscles." *Cyclobenzaprine (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., U.S. Nat'l Library of Med., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009767/ (last visited July 20, 2015).

295.)  Dr. Lossen continued Plaintiff's cyclobenzaprine prescription and prescribed Toradol for Plaintiff's back pain.  (Tr. 295.)

During this visit, Dr. Lossen also discussed Plaintiff's obesity, including Plaintiff's elevated blood pressure and cholesterol.  (Tr. 295.)  Plaintiff indicated that he would like to work on losing weight.  (Tr. 295.)  Dr. Lossen prescribed phentermine to help with weight loss but cautioned Plaintiff that "the medicine will only work as hard as he does, that if he does not make any changes it will not make any difference."  (Tr. 296.)  Dr. Lossen noted that Plaintiff's back pain was a primary factor in preventing him from exercising regularly.  (Tr. 296.)

Plaintiff followed up with Dr. Lossen approximately one month later.  (Tr. 297.)  Plaintiff "continue[d] to report[] significant back pain" and, while "[h]e has been taking some of the diclofenac and cyclobenzaprine, it is not helping so much."  (Tr. 297.)  Plaintiff also reported

> significant pain in his left knee . . . [that] has been going on for about six months and . . . causing him to limp.  He does not recall any injury.  He just woke up with it and it has been getting progressively worse.  He says that it is tender to touch as well.

(Tr. 297.)  Additionally, Plaintiff reported that "he has lost weight but he could not afford the [phentermine]."  (Tr. 297.)

Dr. Lossen observed that Plaintiff was "alert, oriented, [and in] no acute distress.  [Plaintiff m]oves a little slowly as in pain but sits quietly in his chair."  (Tr. 297.)  Plaintiff had "tenderness along the lower lumbar spine" and "[h]is left knee has medial crepitus and tenderness; no redness, no warmth."  (Tr. 297.)  Dr. Lossen ordered MRIs of

Plaintiff's back and left knee. (Tr. 297.) The results of these MRIs do not appear to be in the record.

## B. 2011

Plaintiff saw Dr. Kelly in early January 2011 following a motor-vehicle accident. (Tr. 307.) Plaintiff felt the accident "may have aggravated his back pain." (Tr. 307.) Dr. Kelly observed Plaintiff's "lower extremities are symmetrical with no edema, no deformity. Good pulses in the feet. Reflexes are normal, reactive, and symmetrical. Strength testing is normal." (Tr. 307.) Dr. Kelly prescribed Tramadol, renewed Plaintiff's cyclobenzaprine prescription, and told him to "follow up as needed." (Tr. 307.)

In February, Plaintiff "was brought to the emergency room by police in the early morning hours . . . after being found on the sidewalk agitated and combative." (Tr. 246; *see* Tr. 248.) Plaintiff's physical exam revealed, among other things, "abrasions of the right thigh, right knee[,] and right buttock." (Tr. 246; *see* Tr. 250, 257.) Plaintiff was described as "[v]ery healthy and strong-looking . . . ." (Tr. 256.) Plaintiff was also noted to have a history of knee surgery and back pain. (Tr. 249, 256.) Diagnostic imaging showed:

> Advanced degenerative arthritis right hip and right knee. Large osteophyte adjacent to the right hip joint. No acute right hip or femoral fracture is identified. Right knee joint effusion. No lipohemarthrosis is seen on the crosstable lateral to suggest an intra-articular fracture involving the knee. Soft tissue swelling overlying the right hip and proximal right lateral upper thigh. Degenerative cystic change within the medial tibial tuberosity.

(Tr. 228.)  Plaintiff's diagnoses included, among other conditions, multidrug overdose, obesity, and osteoarthritis in his right hip.  (Tr. 245; *see* Tr. 257, 299.)

Prior to being discharged, Plaintiff met with a physical therapist.  (Tr. 263; *see* Tr. 245-47.)  Plaintiff described "[i]ntermittent" and "[a]ching" pain in his right hip at the intensity of a "6."  (Tr. 263.)  Plaintiff reported that medication helped alleviate his pain and movement aggravated his pain.  (Tr. 263.)  The physical therapist noted that Plaintiff "has had chronic ba[ck] pain but has never had any [physical therapy] or chiropractic care for this."  (Tr. 264.)

The physical therapist noted that Plaintiff is independent with his personal cares, gets the mail, shops, drives, handles his finances, does housework and laundry, and prepares meals.  (Tr. 264.)  Plaintiff was observed to have average range of motion within functional limitations and the strength in his extremities was within functional limitations.  (Tr. 264.)  Plaintiff was also observed to have "good stability with a gait aid as he amb[ulated] around the nursing station."  (Tr. 265.)  Physical therapy was not prescribed at the time, but the physical therapist recommended outpatient physical therapy for Plaintiff's chronic low back pain and right hip and knee pain "to learn therapeutic ex[ercises] and us [sic] modalities PRN."  (Tr. 265.)

Images of Plaintiff's lumbar spine were also taken in February.  (Tr. 318.)  Laurel A. Littrell, M.D., observed: "Mild dis[k] space narrowing at L4 and L5.  Degenerative arthritis both hips, right greater than left.  Large 2 cm corticated calcific density adjacent to the right acetabulum is due to degenerative change, remote trauma or a large normal variant os [sic] acetabula."  (Tr. 318.)

In May, Plaintiff saw Dr. Kelly with complaints of back pain. Plaintiff reported "low back pain that has become increasingly severe." (Tr. 301.) Dr. Kelly noted that Plaintiff "has a long-standing history of back pain, and it sounds as though he has had multiple traumas that have contributed to this." (Tr. 301.) Dr. Kelly additionally noted that Plaintiff

> tells me that he can walk only about 10 minutes and then has to sit down due to his back pain. The back pain radiates into his legs and seems to be bilateral. There is no numbness or tingling. He does have some swelling in his right leg. This is the same leg that had a [deep venous thrombosis] in the past. He has not had any new injury that precipitated this.

(Tr. 301.)

Dr. Kelly observed that Plaintiff

> is an alert, overweight . . . male in no distress. . . . Back is straight. Forward flexion is somewhat limited to about 45 [degrees]. Straight leg raising appears to be negative bilaterally. His reflexes are hypoactive at the ankles and the knees. Strength testing, however, appears to be normal. He does complain of some lower extremity edema. The right leg is worse than the left, but he does have mild pitting edema bilaterally.

(Tr. 301-02.) Dr. Kelly assessed Plaintiff as having "[l]ow back pain with significant disability with radicular pain," noting a concern for spinal stenosis, and "[l]ower extremity edema." (Tr. 302.) Dr. Kelly noted that Plaintiff had a Tramadol prescription for pain, prescribed cyclobenzaprine and furosemide, and ordered an MRI of Plaintiff's lumbar spine. (Tr. 302.)

Dr. Littrell interpreted Plaintiff's MRI. (Tr. 316.) Plaintiff's disks were intact at L1-L2 and L3-L4, and there was "[m]ild to moderate dis[k] space narrowing with dis[k]

desiccation" at L2-L3. (Tr. 316.) Dr. Littrell also noted mild to moderate bilateral ligamentum flavum hypertrophy, mild to moderate spinal canal narrowing, and no or minimal neural foraminal narrowing at L1-L2, L2-L3, and L3-L4. At L4-L5, Dr. Littrell observed:

> Mild to moderate dis[k] space narrowing with a diffuse moderate dis[k] bulge but a more prominent posterior broad-based dis[k] protrusion and bilateral foraminal dis[k] osteophyte complexes. Mild right and advanced left facet hypertrophy with mild bilateral ligamentum flavum hypertrophy. Fluid fills the left facet joint. Findings result in moderate to marked spinal canal narrowing, with an AP canal dimension of 7 mm, and moderate to marked bilateral neural foraminal narrowing. There may be an old healed sclerotic spondylolysis defect on the left.

(Tr. 316.) At L5-S1, Dr. Littrell noted "[d]is[k] desiccation with a mild circumferential dis[k] bulge but slightly more prominent right posterolateral dis[k] protrusion and small left foraminal dis[k] osteophyte complex. Moderate bilateral facet hypertrophy. Findings result in mild spinal canal narrowing and moderate bilateral neuroforaminal narrowing." (Tr. 316.) Dr. Kelly subsequently informed Plaintiff that his MRI showed "multilevel dis[k] disease with spinal canal narrowing and marked bilateral neuroforaminal narrowing at several levels, [and] dis[k] protrusion at L4-L5." (Tr. 302.) Dr. Kelly recommended that Plaintiff consult with neurosurgery. (Tr. 302.)

In mid-June, Plaintiff was seen by Jerry A. Davis, M.D., for "claudicating bilateral leg pain."[3] (Tr. 275.) Plaintiff reported pain "for a number of weeks," making it increasingly "difficult to walk and stand." (Tr. 275.) Plaintiff reported that he needs a

---

[3] Claudication is "[l]imping or lameness." *Claudication*, PubMed Health, Nat'l Ctr. for Biotechnology Info., U.S. Nat'l Library of Med., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0024512/ (last visited July 20, 2015).

cart to lean on when he goes to the grocery store. (Tr. 275.) Plaintiff reported that sitting and resting helps decrease his symptoms, but "[e]ven in a resting condition . . . , he is still having 2/10 pain." (Tr. 275.) Dr. Davis observed that Plaintiff walks with a cane, "but there are no signs of focal weakness." (Tr. 275.)

Dr. Davis reviewed an MRI of Plaintiff's lumbar spine, noting "a number of levels of degenerative change with facet enlargement and degenerative disk disease. However, it is the L4-5 level that has spinal stenosis that could explain his claudicating symptoms." (Tr. 275.) Dr. Davis discussed treatment options ranging "from continued observation to epidural steroids and ultimately surgery." (Tr. 275.) Plaintiff elected to proceed with surgery and a bilateral L4-5 laminotomy was discussed. (Tr. 275.) Dr. Davis noted that Plaintiff "feels that he must be aggressive as the pain is significantly impacting his life." (Tr. 275.)

In late June, Plaintiff saw Dr. Kelly to address a lump on his right thigh, which "came about after [the] hospital stay in February." (Tr. 312.) The lump was hard and painful initially, but now appeared to be fluid-filled. (Tr. 312.) When documenting Plaintiff's history, Dr. Kelly noted that Plaintiff had chronic back pain, was not employed, and was "disabled as a result of chronic back pain." (Tr. 312.) Dr. Kelly noted a "fairly large fluid collection" on Plaintiff's right hip, but that the area was nontender, there was no erythema, it was "not warm to the touch," and there was no bruising. (Tr. 313.) Plaintiff also had "excellent range of motion of the hip." (Tr. 313.) Dr. Kelly aspirated the fluid. (Tr. 313.) Plaintiff returned approximately one week later for additional aspiration, but Dr. Kelly was not able to remove any more fluid. (Tr. 314.)

Dr. Kelly reassured Plaintiff and told him that any additional fluid would "likely . . . re[ab]sorb on its own, given time." (Tr. 314-15.)

During a pre-operative appointment in early July, Plaintiff's diagnosis was listed as "degenerative lumbar spinal stenosis." (Tr. 279; *accord* Tr. 417, 419.) The notes indicate Plaintiff "has been dealing with claudicating bilateral leg pain for about 2 months now. The pain is in the posterior-lateral legs to the feet. Interestingly, he is only able to walk a couple hundred feet before having to rest. Likes to lean on objects for pain. No weakness or sphincter dysfunction." (Tr. 279; *accord* Tr. 417, 419.) It was also noted that Plaintiff experienced deep venous thrombosis "following a knee procedure about 18 months ago." (Tr. 279; *accord* Tr. 417, 419.) The notes further indicate that "[a]ll systems normal except leg pain. Otherwise patient has been feeling well." (Tr. 281; *accord* Tr. 419, 421.) During a physical exam, there was "no weakness in lowers" and Plaintiff "[w]alk[ed] with ease although getting up from the chair is slow and stiff." (Tr. 281; *accord* Tr. 419, 421.)

On July 11, Dr. Davis performed the bilateral L4/5 discectomy. (Tr. 284-85; *accord* Tr. 422-23) The pre and postoperative diagnoses were bilateral leg pain from lumbar disk disease and morbid obesity. (Tr. 284 *accord* Tr. 422.) Dr. Davis noted that the "[p]lanned [l]aminotomies also included bilateral [d]is[c]ectomies as the bulging disk was large enough to continue to compromise the L5 root once the bony decompression had been completed." (Tr. 284; *accord* Tr. 422.) Plaintiff was advised to engage in "activity as tolerated." (Tr. 448; *accord* Tr. 450.)

On July 17, a friend of Plaintiff's and Plaintiff himself called regarding increased pain. (Tr. 271.) Plaintiff described his pain as a "'deep pain'" and a "constant achy pain radiat[ing] from [his] low back, into [his] right hip and lower abdomen." (Tr. 271.) It was painful for Plaintiff to sit or lie down. (Tr. 271.) Plaintiff experienced "slight improvement" with hydrocodone. (Tr. 272.) Dr. Davis encouraged Plaintiff to take Lortab[4] every 3 hours, but no more than 8 times per day; ibuprofen; and cyclobenzaprine and use ice to treat his pain. (Tr. 271.)

Plaintiff had a follow-up appointment on July 25 with Matthew K. Zimmerman, PA-C. (Tr. 270.) Zimmerman observed that Plaintiff

> has equal strength bilaterally at 5/5 when testing the iliopsoas, foot dorsi flexion, foot plantar flexion, and the extensor hallucis longus. Strength is noted at 4/5 bilaterally when testing the quadriceps. [Plaintiff] has an even spontaneous gait. He is able to toe walk, heel walk, and squat and recover with minimal difficulty.

(Tr. 270.) Zimmerman reminded Plaintiff of "the need to continue a 10-pound lifting restriction" and "no pushing, pulling, bending, twisting, or repetitive-type activities." (Tr. 270.) Zimmerman encouraged Plaintiff "to continue walking daily" and "advised [him] to slowly increase his distance as able and to alternate positions every 30 to 40 minutes, and as needed." (Tr. 270.)

On August 11, Plaintiff returned to Dr. Kelly for "[b]ack pain and disability." (Tr. 303.) Dr. Kelly noted that, while Plaintiff's surgery went well, Plaintiff

---

[4] Lortab is a combination of hydrocodone and acetaminophen. *Hydrocodone/Acetaminophen (By mouth) (Lortab)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., U.S. Nat'l Library of Med., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/ (last visited July 20, 2015).

feels, however, that he is still disabled. He is unemployed at the present time and does not feel that he would be employable given his limitations. He finds he cannot sit for too terribly long, he cannot walk for more than about 20 minutes before he has to sit down. Steps cause a pulling sensation into his right groin. The pain no longer radiates down his legs. He was advised by a surgeon that he should not lift anything over 10 pounds, no lawn mowing and no vacuuming. So he is fairly limited in terms of his activity at this point in time. He is scheduled to see the neurosurgeon again on September 16th. He denies any numbness or tingling in his legs. He does describe some rather intense cramping in his back at times.

(Tr. 303.)

Dr. Kelly observed that Plaintiff

is an alert, well-developed, overweight . . . male in no distress. . . . The back appears straight, the incision over his lumbar spine is well healed, appears to be nontender. Forward flexion is fairly normal he can nearly touch the floor with his fingertips. Twisting side to side shows no limitation. Straight leg raising is negative. Range of motion of the hips, knees, and ankles is normal. Strength testing of the lower extremities is normal. Reflexes appear hypoactive bilaterally but are symmetrical. Strength testing is normal.

(Tr. 304.)

Dr. Kelly advised Plaintiff not to become discouraged and "anticipate he will continue to improve." (Tr. 304.) Dr. Kelly discussed physical therapy, but Plaintiff stated that he was planning to move to Georgia the following week. (Tr. 304.) Dr. Kelly "g[a]ve [Plaintiff] the Back Fit Booklet [and] advised he start doing some stretching exercises and try a walking program." (Tr. 304.) Dr. Kelly also wrote a note for Plaintiff stating that he is unable to work through October 15 "due to back surgery and recovery." (Tr. 289; *accord* Tr. 304.)

13

Plaintiff saw Dr. Davis for a follow-up appointment in early September.  (Tr. 359.)

Dr. Davis noted that surgery did "not provide[] significant relief" and Plaintiff "continues

to have severe low back pain and bilateral leg symptoms."  (Tr. 359.)  Dr.  Davis noted

that  Plaintiff's  "excision  is  well-healed  with  no  signs  of  an  infection";  Plaintiff

"ambulates without any signs of focal weakness"; and Plaintiff's "posture is upright and

erect."  (Tr. 359.)  Dr. Davis observed that, "[a]t this point, [Plaintiff] should be, for the

most part, healed completely.  I cannot explain why he is continuing to have symptoms."

Dr. Davis ordered additional images of Plaintiff's lumbar spine and refilled his ibuprofen

and hydrocodone prescriptions.  (Tr. 359.)

Approximately  one  week  later,  Plaintiff  saw  William  E.  Davis,  M.D.  ("Dr.  W.

Davis").  (Tr. 352.)  Plaintiff expressed concern over the lump on his right hip, which Dr.

W.  Davis  described  as  a  "[c]yst  in  [Plaintiff's]  right  buttock  area  about  the  size  of  a

baseball."   Plaintiff reported that the lump was "sometimes tender" and Dr. W. Davis

recommended that Plaintiff consult with a surgeon to see if it could be removed.  (Tr.

352.)  During the physical exam, Dr. W. Davis noted that Plaintiff had joint pain, but no

back  pain  or  muscle  pain.    (Tr.  352.)    At  the  time  of  the  exam,  Plaintiff  was

approximately six feet tall and weighed approximately 288 pounds.  (Tr. 354.)

Towards the end of September, Dr. Davis informed Plaintiff that "x-rays show no

evidence of subluxation or instability."  (Tr. 360; *see* Tr. 362, 443, 458.)  Additionally,

the x-rays showed "[m]ild disk space narrowing at L4-L5 and L5-S1 as evidenced on the

prior MRI"; "[s]everal marginal osteophytes noted in the anterior aspect of the lumbar

spine"; and "[f]acet joint arthropathy noted at L4-L5 and L5-S1." (Tr. 362; *accord* Tr. 443, 458.)

An MRI of Plaintiff's lumbar spine was taken in October. (Tr. 436; *accord* Tr. 441-42, 457.) Lonnie D. Simmons, M.D., observed degenerative spondylolisthesis of L4 and L5 and "soft tissue edema throughout the paraspinous musculature dorsal to L4/5 from interval surgical procedure." (Tr. 436; *accord* Tr. 437, 441, 457.) Additionally, Dr. Simmons observed "degenerative loss of disk signal and height with mild bulge of the annulus fibrosis, bilateral facet arthrosis and ligamentous hypertrophy resulting in moderate left lateral recess stenosis" at L2/3 and "degenerative facet arthrosis and ligamentous hypertrophy" at L3/4. (Tr. 436; *accord* Tr. 441, 458.) At L4/5, Dr. Simmons noted that an "interval left laminotomy and discectomy" had been performed; "[t]here is enhancing epidural granulation tissue in the region without evidence of recurrent disk herniation"; and "[d]isk bulge and facet arthrosis cause mild central canal stenosis and moderate to severe bilateral neural foraminal stenosis." (Tr. 436; *accord* Tr. 441, 458.) At L5/S1, Dr. Simmons observed "degenerative loss of disk signal and height with bulge of the annulus fibrosis with superimposed broad-based right disk protrusion which mildly displaces the right S1 nerve root" as well as "[d]isk bulge and facet arthrosis result in moderate bilateral neural foraminal stenosis." (Tr. 436; *accord* Tr. 441, 458.)

Plaintiff followed up with Dr. Davis in mid-October. (Tr. 423.) Dr. Davis noted as follows:

> [Plaintiff's] repeat MRI shows that the remaining pathology is widespread degenerative disease in the face of a patient who has congenital stenosis. No [sic] adequately address this central stenosis and foraminal narrowing, he would need a wide decompressive procedure and instrumented fusion. This is not a procedure that I would recommend, as I do not believe the results are there, even in the best of situations. He must rely on non-operative measures, therefore, to manage his symptoms. I have recommended Pain Medicine in Winona, which will be closer for him.

(Tr. 423-24.) Dr. Davis then discharged Plaintiff from his care.

### C. 2012

Plaintiff was seen by Molly M. Cerniglia, PA-C, in early March 2012 to address his continuing back pain. (Tr. 424; *accord* Tr. 406.) Cerniglia noted that Plaintiff "saw pain provider, Dr. Verde, in Winona, who recommended steroid injections," but Plaintiff "would prefer for these injections to be done [here] in La Crosse." (Tr. 424; *accord* Tr. 406.) Plaintiff "had some worsening of his back and leg pain last week, but today seems to be at his baseline. He is rating his paint at a 5 out of 10 in his back, buttocks, and legs." (Tr. 424; *accord* Tr. 406.) Cerniglia noted that Plaintiff had gained weight and was currently at 305 pounds. (Tr. 424; *accord* Tr. 406.)

Cerniglia "advised [Plaintiff] that from a surgical standpoint, there is nothing further we can do" for his back pain. (Tr. 424; *accord* Tr. 406.) Cerniglia "offered him an appointment in our Injection Clinic and have set him up to see Dr. Harbst for a lumbar epidural steroid injection" and "recommended that [Plaintiff] follow up in Physical Medicine and Rehabilitation after the injection is completed." (Tr. 424; *accord* Tr. 406.) Plaintiff agreed to this plan and also gave Cerniglia disability paperwork, which she

noted she would discuss with Dr. Davis. (Tr. 425; *accord* Tr. 406.) Plaintiff subsequently saw Timothy A. Harbst, M.D., on March 15 and received an L5-S1 interlaminar injection on the left. (Tr. 426-27, 437; *accord* Tr. 400-05, 440, 451-52, 457.)

In mid-March, Plaintiff returned to Dr. Kelly with concerns over the lump on his right hip. (Tr. 413.) Dr. Kelly noted that the lump "did not change that much even with [aspiration]" and, while Plaintiff was not experiencing pain in his hip, he was bothered by the lump. (Tr. 413.) Dr. Kelly noted that the lump "has not changed much in size in the last year." (Tr. 413.) Upon physical exam, Dr. Kelly observed: "Back is straight. Forward flexion is normal. Over the right hip laterally, he has a large mass. . . . He has full range of motion of the right hip. There is no erythema. No tenderness." (Tr. 414.) Dr. Kelly ordered an ultrasound of the lump. (Tr. 414.)

The ultrasound revealed a hematoma "deep (4-5 cm beneath the skin) within the posterior aspect of [Plaintiff's] right [lower] extremity." (Tr. 412.) It was recommended that Plaintiff "undergo an MRI of the right hip and upper thigh to further evaluate this fluid collection and to evaluate for any underlying muscle or ligamentous injury." (Tr. 412.) The MRI revealed a "[l]arge . . . fluid collection overlaying the right fascia lata at the level of the trochanteric and proximal femoral region consistent with a Morel-Lavallee effusion which is usually due to acute traumatic separation of the subcutaneous fat from the fascia and disruption of the vascular supply." (Tr. 410.) The MRI also showed "[m]oderate to advanced degenerative arthritis of the right hip joint." (Tr. 410.)

Plaintiff returned at the end of March with pain in his tailbone. (Tr. 428; *accord* Tr. 393-97, 452-53.) He was seen by Traci A. Moe, APNP. (Tr. 427; *accord* Tr. 393-97, 452-53.) Plaintiff reported that the injection improved his pain by "approximately 20%." (Tr. 428; *accord* Tr. 393, 395, 396, 452.) Plaintiff reported "some low back spasms and sharp pain in his coccyx region." (Tr. 428; *accord* Tr. 393, 395, 396, 452.) Plaintiff reported having difficulties sitting. (Tr. 428.) Plaintiff stated that, "[w]hen sitting in a chair, he sits forward as to take pressure off his buttocks." (Tr. 428; *accord* Tr. 393, 395, 396.) Moe noted that Plaintiff "was sitting for long periods of time at work, 2 hours at a time with a 10-minute break in between" and "[s]itting down for eight hours per day." (Tr. 428; *accord* Tr. 393, 395, 396-97, 452.) Plaintiff reported that he was less active and "would like to be more active, but this is somewhat difficult with low back pain." (Tr. 428; *accord* Tr. 393, 395, 397, 452-53.) Plaintiff reported that he lost 9 pounds, however, by watching his diet. (Tr. 428; *accord* Tr. 393, 395, 397, 452.)

Moe made the following observations:

> Weight is 296 pounds. Pain in his back is rated at a 4. He is alert, oriented and in no acute distress. He gets up slowly from a seated position. Gait is nonantalgic. He is very tender to the touch with palpation of his coccyx. He does have some mild tenderness in the lumbar paraspinal musculature, right greater than left.

(Tr. 428; *accord* Tr. 393, 395, 397, 453.)

With respect to Plaintiff's lumbar disk disease, Moe noted that Plaintiff "is not a surgical candidate." (Tr. 428; *accord* Tr. 393, 395, 397, 453.) Plaintiff did not want to have another injection in either the lumbar or coccyx region as "he is not particularly

keen on the idea of needles." (Tr. 428; *accord* Tr. 393, 395-96, 397, 453.) Moe prescribed diclofenac gel 1%[5] for Plaintiff's coccyx pain and advised Plaintiff that he could continue taking his hydrocodone on an "as-needed basis" as well as Flexeril. (Tr. 428; *accord* Tr. 393, 395, 397, 453.) Plaintiff was to follow up with Dr. Harbst in six weeks. (Tr. 429; *accord* Tr. 393, 396, 397, 453.)

Plaintiff saw Dr. Harbst towards the end of May. (Tr. 430; *accord* Tr. 389-91, 453-54.) Plaintiff "present[ed] with ongoing lumbosacral pain in the low back, buttock, and right thigh with some achiness into the feet and numbness into the feet. He rates his pain as a 5/10 today with the most being a 9/10." (Tr. 430; *accord* Tr. 389, 390, 391, 454.) Dr. Harbst noted that Plaintiff "has undergone one epidural injection which he did not feel yielded significant benefit." (Tr. 430; *accord* Tr. 389, 390, 391, 454.) Plaintiff reported that "the only thing that helped him was hydrocodone which he took and is using, and he states he is out of that." (Tr. 430; *accord* Tr. 389, 390, 391, 454.) Plaintiff also reported that the cyclobenzaprine "makes him feel sluggish." (Tr. 430; *accord* Tr. 389, 390, 391, 454.) After reviewing Plaintiff's medications, Dr. Harbst noted that "we [do not] have a whole lot of options available." (Tr. 430; *accord* Tr. 389, 390, 391, 454.) Dr. Harbst prescribed gabapentin and told Plaintiff to return in one month. (Tr. 430; *accord* Tr. 389, 390, 391, 454.)

Plaintiff followed up one month later and was seen by Moe. (Tr. 431; *accord* Tr. 454.) Plaintiff continued to have "back, buttock, and lower extremity pain." (Tr. 431; *accord* Tr. 454.) Plaintiff reported that

---

[5] This was subsequently changed to Lidocaine cream due to a manufacturing shortage. (Tr. 429.)

> it is hard to stand for prolonged periods of time. He is able to
> go grocery shopping but only if he is able to use a cart to help
> him. He states that if he had a cart to lean over he could walk
> for quite awhile. However, this is not the case always.

(Tr. 431; *accord* Tr. 454.) Plaintiff rated his pain at a "6." (Tr. 431; *accord* Tr. 455.) Plaintiff also complained that the gabapentin caused "sexual dysfunction." (Tr. 431; *accord* Tr. 455.)

Moe observed that Plaintiff weighed 302 pounds; "change[d] positions slowly"; and, although having a non-antalgic gait, "does take his time." (Tr. 431; *accord* Tr. 455.) Moe prescribed Lyrica and told Plaintiff to continue taking Flexeril and using Lidocaine "on an as-needed basis." (Tr. 432; *accord* Tr. 455.) Plaintiff's Lyrica prescription was subsequently switched to nortriptyline for insurance reasons. (*See* Tr. 432-34.)

Plaintiff saw Dr. Harbst again in early September. (Tr. 435; *accord* Tr. 455-56.) Dr. Harbst noted that Plaintiff has congenital spinal stenosis, resulting in "persistent pain across the lumbosacral region down the left leg and into both feet." (Tr. 435; *accord* Tr. 456.) Dr. Harbst noted that Plaintiff did not have any relief from the nortriptypline and started Plaintiff on Lyrica. (Tr. 435; *accord* Tr. 456.)

Plaintiff next saw Dr. Harbst in mid-November. (Tr. 446; *accord* Tr. 472.) Dr. Harbst noted that Plaintiff's congenital spinal stenosis resulted in surgery in 2011 and "right L5-S1 dis[k] herniation giving rise to effacement of the S1 nerve root." (Tr. 446; *accord* Tr. 472.) Plaintiff had

> achiness and burning about the right shoulder and upper
> extremity with achiness, stabbing, and numbness. He has
> achiness and stabbing throughout the lumbosacral region,
> achiness into both legs, and numbness into both feet. He

> indicates that his pain today is a 7 out of 10, the least is a 5
> out of 10, the most is an 8 out of 10.  This gentleman has been
> treated from a conservative standpoint with a trial of
> gabapentin which he did not tolerate, nortriptyline which did
> not help him.  He most recently started Lyrica . . . which is
> causing some side effects of blurred vision, weight gain, and
> [he] does not feel that it is helping him meaningful[ly] with
> his pain.

(Tr. 446; *accord* Tr. 472-73; see Tr. 214.)

Dr. Harbst noted Plaintiff was willing to try another spinal epidural injection "given the severity of his discomfort."  (Tr. 446; *accord* Tr. 473.)  Dr. Harbst also surmised that Plaintiff could return to Dr. Davis to see if they are any surgical options available, but Dr. Harbst was "not optimistic, though, that there are good options surgically."  (Tr. 446; *accord* Tr. 47.)  Dr. Harbst also considered a spinal cord stimulator, but did not think Plaintiff would tolerate this treatment "given his aversion to the epidural injections."  (Tr. 446; *accord* Tr. 473.)  Lastly, Dr. Harbst discontinued the Lyrica prescription and prescribed Topamax instead.  (Tr. 446; *accord* Tr. 473.)  Plaintiff received the second injection approximately ten days later.  (Tr. 469-71.)

### D. 2013

The only record from 2013 is a note on January 2 that Plaintiff has an appointment with Dr. Davis scheduled for January 23 to discuss disability-related paperwork.  (Tr. 468.)

## IV. DISABILITY-RELATED REPORTS & ASSESSMENTS

On August 29, 2011, Plaintiff participated in a face-to-face interview with state agency personnel.  (Tr. 162.)  Among other things, the interviewer noted that Plaintiff had no difficulty sitting, standing, or walking.  (Tr. 162.)

Plaintiff also completed a Disability Report.  (Tr. 164-72.)  Plaintiff reported that he was approximately six feet tall and weighed 290 pounds.  (Tr. 165.)  Plaintiff reported that he has back and knee injuries that cause pain and limit his ability to work.  (Tr. 165.)  Plaintiff reported that he last worked in November 2009 and he stopped working "[b]ecause of my condition(s) and other reasons."  (Tr. 165.)  Plaintiff stated that he "had surgery and tried going back to work and then wasn't able to do the work."  (Tr. 165.)  Plaintiff also reported, however, that his conditions did not cause him to make changes in his work activities.  (Tr. 165.)  Plaintiff reported that he was currently taking cyclobenzaprine for muscle spasms.  (Tr. 168.)

Medical consultant Steven Richards, M.D., completed a physical residual functional capacity assessment in mid-September.  (Tr. 332; *see* Tr. 325-32.)  Dr. Richards diagnosed Plaintiff with an L4-5 discectomy and left knee pain.  (Tr. 325.)  Dr. Richards opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for six hours in an eight-hour day; sit with normal breaks for six hours in an eight-hour day; and was unlimited in his ability to push and/or pull within the lifting restrictions previously identified.  (Tr. 326.)  In support of these restrictions, Dr. Richards noted Plaintiff's back surgery approximately two months earlier and positive results, but also noted that Plaintiff had experienced

"progressive postoperative pain." (Tr. 326-27.) Dr. Richards also noted Plaintiff's height and weight. (Tr. 327.) Dr. Richards opined that Plaintiff "should be able to perform light work one year from onset." (Tr. 327.)

As for postural limitations, Dr. Richards opined that Plaintiff could frequently climb ramps and stairs, but only occasionally climb ladders, ropes, and scaffolds. (Tr. 327.) Dr. Richards opined that Plaintiff could frequently balance. (Tr. 327.) Lastly, Plaintiff was able to occasionally stoop, kneel, crouch, and crawl. (Tr. 327.) Dr. Richards found no manipulative, visual, communicative, or environmental limitations. (Tr. 328-29.)

With respect to Plaintiff's symptoms, Dr. Richards opined that Plaintiff's impairments "could reasonably be expected to produce the alleged symptoms, and the allegations are not inconsistent with objective findings in the record. (Tr. 330.)

Plaintiff completed another Disability Report around mid-September as well. (Tr. 175, 179.) Plaintiff reported that his "conditions have gotten worse," but he was not able to pinpoint when the change(s) occurred and stated that he did not have any additional limitations. (Tr. 175.) Plaintiff reported that he was being treated by Dr. Davis for back pain and Dr. Kelly for pain and swelling. (Tr. 176; *see* Tr. 177.) Plaintiff reported that the cyclobenzaprine he was taking caused dizziness and drowsiness. (Tr. 177.) Plaintiff also reported that he was taking hydrocodone for pain, which caused drowsiness, and ibuprofen for inflammation, which caused drowsiness and dizziness. (Tr. 177.) Plaintiff reported that he "ha[d] to take breaks between chores" and has had increased difficulty sitting, walking, and standing. (Tr. 178.) Plaintiff stated that "[h]e cannot sit for longer

than 15 minutes" and "cannot walk or stand for longer than 10-15 minutes . . . without a lot of pain." (Tr. 178.)

In October, Plaintiff completed a Work History Report. (Tr. 181; *see* Tr. 140.) Plaintiff reported that he recently started a temporary position assembling electronics, which had "disability accommodations." (Tr. 181; *see* Tr. 182.) When describing his work, Plaintiff reported that he worked eight hours per day five days per week, and those eight hours were spent sitting, reaching, and handling small objects. (Tr. 182.) Plaintiff explained that he "only lift[s] small individual electronic parts" and "[t]he only time [he] walks is when [he] ha[s] to restock [his] station with assembly parts." (Tr. 182.) Plaintiff stated that he "push[es] a cart to [his] station," sits, and restocks "the little parts containers" at the end of his shift. (Tr. 182.) Plaintiff reported that he frequently lifts less than 10 pounds and the heaviest weight he lifts is less than 10 pounds. (Tr. 182.)

On reconsideration, state agency consultant Richard Hadden, M.D., reviewed Dr. Richards's assessment and affirmed it as written. (Tr. 364, 365.)

Around the same time, medical consultant Gregory H. Salmi, M.D., also assessed Plaintiff's physical residual functional capacity. (Tr. 367.) In addition to the L4-5 discectomy and left knee pain diagnosed by Dr. Richards, Dr. Salmi listed a secondary diagnosis of obesity. (Tr. 367.) Dr. Salmi identified the same exertional limitations as Dr. Richards. (Compare Tr. 368 *with* Tr. 326.) Dr. Salmi also noted Plaintiff's general recovery from back surgery; his ability to maintain an "upright and erect posture and ambulat[e] w[ith]o[ut] signs of focal weakness"; "normal [range of motion], strength and motor function w[ith]o[ut] focal defects"; and normal lumbar x-ray. (Tr. 374.) Dr. Salmi

also identified the same postural limitations as Dr. Richards with two exceptions. (*Compare* Tr. 369 *with* Tr. 327.) First, Dr. Salmi stated that Plaintiff could only occasionally climb ramps and stairs, rather than frequently. (Tr. 369.) Second, Plaintiff could only occasionally balance, rather than frequently. (Tr. 369.) Like Dr. Richards, Dr. Salmi found no manipulative, visual, communicative, or environmental limitations. (Tr. 370-71.) Dr. Salmi similarly assessed Plaintiff's symptoms, noting that they are attributable to his impairments and not disproportionate to the expected severity or duration, and Plaintiff "would appear to be reasonably credible." (Tr. 372.)

Plaintiff completed another Disability Report in January 2012. (Tr. 194-98.) Plaintiff reported that his conditions had worsened around November 2011. (Tr. 194.) Plaintiff sated that he had "pain between [his] shoulders," his "legs hurt constantly," and he was not able to "walk more than 5 minutes." (Tr. 194.) Plaintiff reported that he was still seeing Dr. Davis for treatment of back pain and Dr. Kelly for pain and swelling. (Tr. 195.) In addition to dizziness and drowsiness, Plaintiff reported that his cyclobenzaprine was causing blurred vision. (Tr. 196.) Plaintiff was also experiencing dizziness as well as drowsiness with the hydrocodone and, while Plaintiff no longer experienced drowsiness from the ibuprofen, he did have dizziness and an upset stomach. (Tr. 196.) Plaintiff again reported difficulties with household chores, noting that he is not able to "clean continuously" and "ha[s] to take breaks for something as simple as vacuuming." 9Tr. 197.) As for changes in his daily activities, Plaintiff reported that he is "either sitting[] or lying down the majority of the time because it hurts badly to stand." (Tr. 197.) Plaintiff stated that he is "still absolutely disabled." (Tr. 198.)

Dr. Davis completed a residual functional capacity questionnaire in April 2012. (Tr. 385-86.) Dr. Davis described his contact with Plaintiff as the 2011 back surgery and a "recent visit in March 2012." (Tr. 385.) Dr. Davis listed Plaintiff's diagnoses as disk herniation at L4-5, a bilateral discectomy at L4-5 in 2011, and "failed back syndrome." (Tr. 385.) Dr. Davis considered Plaintiff's prognosis to be "poor" and stated Plaintiff's symptoms consisted of "[b]ack and bilateral leg pain." (Tr. 385.) Dr. Davis stated that Plaintiff's medications caused dizziness, drowsiness, and decreased alertness. (Tr. 385.)

Dr. Davis opined that Plaintiff's symptoms were severe enough to interfere frequently with his ability to maintain the attention and concentration needed "to perform simply work-related tasks." (Tr. 385.) Dr. Davis also opined that Plaintiff would "need a job which permits shifting positions at will from sitting, standing or walking" and would need to recline or lie down in a typical eight-hour day in excess of the time allotted for normal breaks. (Tr. 385.) Additionally, Dr. Davis stated that Plaintiff would need to take unscheduled breaks every hour for approximately ten minutes "or until symptoms improve." (Tr. 385.) When asked how many blocks Plaintiff was able to walk "without rest or significant pain," Dr. Davis wrote "unknown." (Tr. 385.) When asked to state the amount of time that Plaintiff was able to sit and stand/walk at any one time, Dr. Davis wrote "unknown." (Tr. 385.) Similarly, when asked to indicate the number of hours Plaintiff could sit and stand/walk in an eight-hour day, Dr. Davis wrote "unknown." (Tr. 385.)

Dr. Davis opined that Plaintiff could lift ten pounds or less frequently, 20 pounds occasionally, and never 50 pounds. (Tr. 386.) Dr. Davis opined that Plaintiff was limited

to using his arms 50% of the time for reaching in an eight-hour day, but was otherwise able to use his hands for grasping, turning, and twisting and his fingers for fine manipulation for the entire period.  (Tr. 386.)  Dr. Davis opined that Plaintiff was likely to be absent from work three to four times per month as a result of his impairments.  (Tr. 386.)

Dr. Davis answered "No" when asked if Plaintiff was a malingerer and stated that Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations" set forth in the questionnaire.  (Tr. 386.)

## V. ALJ PROCEEEDINGS & DECISION

### A.  Hearing Testimony

At the hearing, Plaintiff discussed some of his most recent employment.  (*See* Tr. 37-38.)  Plaintiff testified that he last worked for a temporary personnel service, which placed him with a company where he "assemble[d] small electronic parts."  (Tr. 37.)  Plaintiff testified that he was laid off from the position in March 2012.  (Tr. 37-38.)

Prior to assembling electronic parts, Plaintiff worked for a company where "[c]ertain tasks required [him] to stand and scan labels . . . ."  (Tr. 38.)  Plaintiff told his employer that he was not able to stand and scan, and the employer allowed him to sit.  (Tr. 38.)  Plaintiff testified that he had difficulty "sitting for long periods of time" and "would get stiff and sore."  (Tr. 38.)  Plaintiff testified that he would take frequent "bathroom breaks" in order to stand and stretch before returning to work.  (Tr. 38.)

Plaintiff testified that he has tried looking for other work but "had no luck" and "hasn't found anything that [he] could actually do." (Tr. 39.) Plaintiff said he would try electronic-parts assembly again, so long as he could take breaks. (Tr. 39.)

Plaintiff testified that "[n]obody knows" the root cause of his back injury. (Tr. 42.) Plaintiff testified that, while working "a prior job," he "missed the step unloading the train, injured[/]hit my right leg, had surgery on it[,] and after that [he] ha[s]n't been the same." (Tr. 42.) Plaintiff testified that he recently received a "second injection" and the injections have not helped with his pain. (Tr. 43.)

Plaintiff also testified about difficulties with his right hip. (Tr. 43.) Plaintiff testified he has "arthritis in [his] hips and . . . will apparently need to have hip replacement sometime in the future." (Tr. 43.) Plaintiff described the pain in his hip as a "throbbing" pain, ranging from "sharp to dull." (Tr. 43.) Plaintiff testified that "every now and then . . . [he gets] a real sharp pain that shoots into [his] hips." (Tr. 43.)

Plaintiff testified about his difficulties walking, standing, and sitting. Plaintiff testified that he has difficulties walking after going approximately 40 yards. (Tr. 39, 40.) Plaintiff testified that his back "gets really tight." (Tr. 39.) Plaintiff testified that he uses carts to lean on while shopping in stores with his fiancée and is anxious to sit down on a bench once they reach the checkout line. (Tr. 39, 40.) Plaintiff testified that he has "tr[ied] to exercise . . . [and] to get some of th[e] weight off . . . but it's hard." (Tr. 40.)

Plaintiff testified that he can stand for approximately five minutes before his lower back and legs begin to tighten up, and then he needs to go sit down and stretch. (Tr. 40.) Plaintiff testified that he can sit for approximately 35 minutes before his "lower back gets

tight" and he starts feeling a "pulling" into his buttocks and down his legs. (Tr. 41.) Plaintiff testified that, when he is walking and standing, the pain is most intense in his back and, when sitting, the pain is in his legs. (Tr. 41.) Plaintiff also testified that he experiences a constant numbness in his feet, whether sitting or standing. (Tr. 41.)

When asked whether there were any limits on the amount of weight he could lift, Plaintiff testified that his doctor had given him a 20-pound restriction. (Tr. 41.) Plaintiff testified that he tried lifting and carrying two half-gallon jugs and, after 15 feet, he could "feel it pulling in [his] back." (Tr. 42.)

Plaintiff testified that he has not used any illegal drugs, or even smoked, since the hospitalization in February 2011. (Tr. 42.) Prior to that hospitalization, Plaintiff testified that it had been "over five" years since he had used any illegal drugs. (Tr. 42.)

Plaintiff also testified about his daily activities. (Tr. 44-46.) Plaintiff testified that, when making a meal, he is not able to stand longer than five minutes, so he will complete one step of the process, sit down and take a break, complete the next step, and sit down and take a break. (Tr. 44.) For example, Plaintiff testified that when he is "baking chicken or a chicken breast," he will cut up the chicken, then sit down, return to place the chicken in a pan and into the oven, and then sit down again. (Tr. 44.) Plaintiff testified that he is not able to do laundry or take out the garbage. (Tr. 44.) Plaintiff testified that "it's hard" because he "used to like to work" and "at this point," he can hardly do anything. (Tr. 44.) Plaintiff testified that "[i]t's really rough and people are always suggesting to [him] what [he] can do and they're not in [his] situation and it's really frustrating." (Tr. 44.)

Plaintiff testified that he spends about an hour per day on the computer looking for a "way to make money," such as an "online job[]" or "[s]omething [Plaintiff] could do from home." (Tr. 45.) Plaintiff also testified that he has some recording software, "like a home recording studio," as a hobby. (Tr. 45.) Plaintiff testified that he spends about two hours per day playing video games, about one and a half hours per day watching television, and three hours per day laying down in his La-Z-Boy recliner. (Tr. 46.)

The ALJ asked the vocational expert to assume a hypothetical individual of Plaintiff's

> age, education, and work experience who is able to do sedentary work with no climbing of ladders, ropes or scaffolds, occasional climbing of ramps or stairs; occasional stooping and crouching with no kneeling and crawling. Overhead reaching is limited to occasional bilaterally, must avoid all use of hazardous machinery . . . [which] is unshielded moving machinery; must also avoid all exposure to unprotected heights. Work is limited to simple . . . [,] routine and repetitive tasks with no strict production quota with the emphasis being on a per shift rather than a per hour basis . . . [i.e.,] an employer would require so many widgets per day versus so many widgets per hour.

(Tr. 49.)

The vocational expert testified that such a person could not perform Plaintiff's past work as a mover, order packer, tree trimmer, or forklift operator, but could work as a document preparer, lens inserter, and an order clerk. (Tr. 49.) The ALJ then asked the vocational expert to consider the same hypothetical individual but with an additional limitation that there be "a sit/stand option allowing the person to sit or stand alternatively at will provided the person is not off task by more than 10 percent of the work period."

(Tr. 50.)  The vocational expert testified that the same three jobs would still be available. (Tr. 50.)

The ALJ then asked the vocational expert to consider an additional limitations where the hypothetical "person would have two or more unexcused or unscheduled breaks in a workday in addition to regularly scheduled breaks."  (Tr. 50.)  The vocational expert testified that such a limitation would "preclude work at all exertional levels."  (Tr. 50.)  Lastly, the ALJ asked the vocation expert to consider whether the same hypothetical person would be precluded from working if there were "two or more unexcused or unscheduled absences in a month on a continuing basis."  (Tr. 50.)  The vocational expert testified that such a limitation would preclude employment.  (Tr. 50.)

### B.  ALJ Decision

The ALJ found and concluded that Plaintiff had the severe impairments of disorder of the back, degenerative joint disease in his right knee and right hip, and obesity, and none of these impairments when considered individually or in combination met or equaled listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16.)  The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work with the additional restrictions that there be

> no climbing ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs; only occasional stooping or crouching; no kneeling or crawling; only occasional bilateral overhead reaching; no exposure to hazardous machinery or unprotected heights; and due to pain, . . . [Plaintiff] is limited to SIMPLE [work] . . . , involving routine tasks; with no strict production quotas and an emphasis on a per shift rather than per hour basis.

31

(Tr. 16.)

In reaching this residual functional capacity, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 17.) The ALJ noted that Plaintiff "has a disorder of the back, which relegates him to the sedentary exertional restrictions described above," and the fact that Plaintiff underwent surgery for this impairment "certainly suggests the symptoms are genuine." (Tr. 17.) The ALJ observed, however, that "[w]hile that fact would normally weigh in [Plaintiff's] favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms," pointing to unremarkable follow-up imaging, showing "normal spine alignment[] with only mild dis[k] space narrowing at L4-L5 and L5-S1, along with some facet joint arthropathy at those levels." (Tr. 17.) The ALJ also pointed to examinations showing that Plaintiff "was able to ambulate without signs of focal weakness," had an "upright and erect" posture," and "displayed normal extremity range of motion, normal strength, and normal motor function without focal deficits." (Tr. 17-18; *see* Tr. 18.)

The ALJ described Plaintiff's treatment since the 2011 surgery as "quite routine and conservative," noting the absence of "pain clinic treatment, the use of a TENS unit, ongoing physical therapy, emergency treatment for back pain, further surgery (he is not even a candidate)[,] or the need for an assistive ambulatory device." (Tr. 18.) The ALJ noted that, "[f]ollowing a March 2012 epidural steroid injection, [Plaintiff] was able to ambulate independently and without difficulty," and the fact that "[h]e underwent another

epidural steroid injection in November 2012 . . . indicates his overall satisfaction with this treatment modality (and contradicts his assertions that the first injection did not work)." (Tr. 18 (citation omitted).)

As for Plaintiff's degenerative joint disease in his right knee and hip, the ALJ noted that, while these impairments "further contribute to the residual functional capacity's restrictions," Plaintiff "has retained full range of [his right hip] joint" despite imaging showing "moderate to advanced degenerative arthritis." (Tr. 18.) The ALJ observed that "[t]here is no evidence of any treatment for this condition." (Tr. 18.) The ALJ also noted that Plaintiff "has a history of arthroscopic repair of his right ACL, which apparently took place prior to the amended alleged onset of disability." (Tr. 18.) The ALJ focused on the fact that Plaintiff "retains the ability to ambulate independently," and concluded that, "based upon the objective evidence, there is no need to impose any additional work-related restrictions." (Tr. 18.)

The ALJ cited a number of things impacting Plaintiff's credibility. (*See* Tr. 18-19.) First, the ALJ found that Plaintiff's "description of the severity of the pain has been so extreme as to appear implausible[] when compared with the minimal clinical findings and signs. The account of the symptoms and limitations which [Plaintiff] has provided throughout the record has generally been vague, inconsistent, and unpersuasive." (Tr. 18.) The ALJ also noted that while Plaintiff "has not alleged any specific limitations or pain related to his obesity . . . , the [ALJ] . . . considered [Plaintiff's] extreme corpulence and its impact on all of his body systems in formulating the residual functional capacity per Social Security Ruling SSR 02-1p." (Tr. 18.)

Second, the ALJ took into account Plaintiff's work activities. (Tr. 18-19.) The ALJ noted that Plaintiff "stopped working due to a business-related layoff rather than because of the allegedly disabling impairments" and "there is no evidence of a significant deterioration in [Plaintiff's] medical condition since that layoff." The ALJ concluded that "[a] reasonable inference, therefore, is that [Plaintiff's] impairments would not prevent the performance of that job[]since it was being performed adequately at the time of the layoff despite a similar medical condition ([Plaintiff] stated that if he were called back to work, he would try)." (Tr. 18.) The ALJ stated that Plaintiff's job search following the layoff and receipt of unemployment benefits "contradicts his assertions that he is unable to work." (Tr. 18.) Further, the ALJ observed that Plaintiff's "extended work history shows that he worked only sporadically prior to the alleged disability onset date, which raises a question as to whether his continuing unemployment is actually due to medical impairments." (Tr. 19.) The ALJ concluded that Plaintiff's "poor long-term work history greatly undermines his allegations he is now medically disabled from full-time employment." (Tr. 19.)

Third, the ALJ considered Plaintiff's daily activities. (Tr. 19.) The ALJ stated that

> [a]lthough [Plaintiff] has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding [Plaintiff] disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [Plaintiff's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Plaintiff's] medical condition, as opposed to

34

> other reasons, in view of the relatively weak medical
> evidence and other factors discussed in this decision.

(Tr. 19.)  The ALJ also observed that Plaintiff "admitted to carrying out some daily

activities that are not limited to the extent one would expect[] given the complaints of

disabling symptoms and limitations," including

> cook[ing] (in short shifts); spend[ing] time on his computer,
> where he looks for opportunities to make money; go[ing]
> grocery shopping (although [Plaintiff] claimed he must sit on
> a bench); record[ing] music in his home recording studio;
> play[ing] videogames for 2 1/2 hours per day; surf[ing] the
> Internet 1 1/2 hours a day; and watch[ing] television and
> films on Netflix from his Lay-Z-Boy recliner.

(Tr. 19.)  The ALJ concluded that "[t]hese activities are fully consistent with, and likely

in excess of, the residual functional capacity."  (Tr. 19.)

As for the medical opinion evidence, the ALJ noted that both medical consultants

Drs. Richards and Salmi "reached largely similar conclusions" that Plaintiff "is capable

of full-time work at a light exertional level with some postural restrictions."  (Tr. 19.)

The ALJ gave their opinions "great weight" because "their findings are consistent with

the substantial evidence, including clinical findings and signs; [Plaintiff's] response to

treatment; and [Plaintiff's] relatively unhindered daily activities."  (Tr. 19.)  The ALJ

concluded, however, "based upon the more recently submitted evidence, when coupled

with [Plaintiff's] subject[ive] complaints," the "even more restrictive sedentary exertional

and nonexertional limitations" were appropriate.  (Tr. 19.)

With respect to Dr. Davis, the ALJ found his opinion that Plaintiff would need 10

minute breaks every hour in order to lie down and "likely miss work three or four days

per month because of his pain symptoms and/or treatment" to be "wildly at odds with the minimal clinical objective findings and signs described in the record." (Tr. 20.) The ALJ concluded that "[i]n formulating his speculations as to [Plaintiff's] work[]ability, Dr. Davis apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported." (Tr. 20.) The ALJ concluded that, "as explained elsewhere . . . , there exist good reasons for questioning the reliability of [Plaintiff's] subjective complaints," and, "[b]ecause Dr. Davis'[s] opinion is simply not consistent with the medical records, the . . . opinion has [been] given . . . little weight." (Tr. 20.)

The ALJ found and concluded that Plaintiff was unable to perform his past relevant work, but that jobs exist in significant numbers in the national economy that Plaintiff can perform and, therefore, Plaintiff has not been under a disability as defined in the Social Security Act. (Tr. 20-21.)

## VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "If, after reviewing the record, the court

finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quotation omitted).

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

Plaintiff is representing himself and the Court has given his motion and supporting memorandum the benefit of the liberal construction accorded to pro se litigants.  *See Jackson v. Nixon*, 747 F.3d 537, 541 (8th Cir. 2014) (pro se litigants held to "less stringent standards" than lawyers); *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004) (court should construe pro se submissions "in a way that permits the layperson's claim to be considered within the proper legal framework").  Plaintiff asserts that the ALJ erred by (1) concluding Plaintiff's back disorder did not meet listing 1.04C; (2) not giving appropriate weight to Dr. Davis as Plaintiff's treating physician; and (3) improperly weighing Plaintiff's credibility.

## A. Listing 1.04C

The ALJ concluded that "the medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis[,] or lumbar spinal stenosis as required under listing 1.04.  Moreover, there is no evidence that [Plaintiff's] back disorder has resulted in an inability to ambulate effectively . . . ."  (Tr. 16.)

Plaintiff argues that "[t]he medical record supports only one conclusion, that Plaintiff suffers from a serious condition of his lower ba[c]k involving dis[k] herniation giving rise [to] effacement of the S[1] nerve root (spinal stenosis), causing radiating pain into legs and feet."  (Pl.'s Mem. in Supp. at 10, ECF No. 12.) Plaintiff argues that the ALJ "frankly ignored most of the evidence concerning [his] condition, especially the

38

facts supporting the proposition that [his] back condition meets or equals the applicable listing." (Pl.'s Mem. in Supp. at 11.)

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010); *see Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) ("If the claimant wins at the third step (listed impairment), he must be held disabled, and the case is over." (quotation omitted)). "If the ALJ finds that a claimant has an impairment that meets or equals one of the listings, then the claimant will be found disabled." *Carlson*, 604 F.3d at 592 (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii), (d).

"The claimant has the burden of proving that his impairment meets or equals a listing." *Carlson*, 604 F.3d at 593. "To meet a listing, a claimant must show that he or she meets all of the criteria for the listed impairment." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). "[M]erely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify." *Lott*, 772 F.3d at 549 (quotation omitted); *accord Blackburn*, 761 F.3d at 858.

Listing 1.04C addresses "[l]umbar spinal stenosis . . . resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, subpt. P, app. 1 § 1.04C. The "[i]nability to ambulate effectively means an extreme limitation of the ability to

walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00B2b(1). "Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.*

"To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." *Id.* § 1.00B2b(2).

> [E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.* "A physical . . . impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. § 404.1508; *accord* 20 C.R.F. § 416.908 (same); *see* 20 C.F.R. §§ 404.1527(a), 416.927(a).

There is no medical evidence in the record demonstrating Plaintiff had an inability to ambulate effectively as of his alleged onset date. While Plaintiff had a history of back, knee, and leg pain, and, on at least one occasion, was noted as using a cane prior to his surgery in 2011, Plaintiff was observed to have a non-antalgic gait and the ability to

ambulate without focal weakness following his surgery. There is no evidence in the record that Plaintiff continued to use a cane or other assistive device on a routine basis following his surgery, although he did find it necessary to lean on a cart while shopping. And while Plaintiff was at times observed to have a slower pace, his treatment providers encouraged him to walk more. Accordingly, the Court concludes that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was able to ambulate effectively as defined in the regulations and therefore Plaintiff's back disorder did not meet listing 1.04C.

### B. Residual Functional Capacity

Plaintiff's remaining arguments are both directed at the ALJ's determination of his residual functional capacity. A claimant's "residual functional capacity is the most [he] can do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1) (same); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."

*Id.* (quotation omitted); *see* 20 C.F.R. §§ 404.1546(c), 416.946(c). Plaintiff argues that the ALJ failed to weigh properly his credibility and give treating physician Dr. Davis's opinion controlling weight when determining his residual functional capacity.

### 1. Credibility Determination

When determining a claimant's residual functional capacity, the ALJ is required to take into account a claimant's subjective complaints. *Perks*, 687 F.3d at 1092; *see* 20 C.F.R. §§ 404.1529, 404.1545(a)(3), (e), 416.929, 416.945(a)(3), (e). "In assessing a claimant's credibility, an ALJ must consider all of the evidence related to the subjective complaints, the claimant's daily activities, observations of third parties, and the reports of treating and examining physicians." *McCoy*, 648 F.3d at 614 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "If an ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, [courts] will normally defer to the ALJ's credibility determination." *Id.*

Plaintiff asserts that the ALJ erred by not fully crediting his subjective complaints of disabling pain. "When analyzing a claimant's subjective complaints of pain, the ALJ must examine: (1) the claimant's daily activities, (2) the duration, frequency and intensity of the pain, (3) precipitating and aggravating factors, (4) the dosage, effectiveness and side effects of any medication, and (5) functional restrictions." *Perks*, 687 F.3d at 1092-93 (citing *Polaski*, 739 F.2d at 1322); *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). "[T]he ALJ need not explicitly discuss each [of these] factor[s]. The ALJ only need acknowledge and consider [them] before discounting a claimant's subjective complaints."

*Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (citation omitted); *accord Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

Plaintiff argues that the record is not inconsistent because it shows that he kept returning to his treatment providers with complaints of pain and was referred for a pain-management consultation. (Pl.'s Mem. in Supp. at 9-10.) Plaintiff also argues that his daily activities are not inconsistent with complaints of disabling pain. (Pl.'s Mem. in Supp. at 10.) Additionally, Plaintiff argues that the ALJ mischaracterized the statements of his treatment providers regarding surgery and failed to take into account the side effects Plaintiff experienced from his pain medications. (Pl.'s Mem. in Supp. at 6-7.)

The Commissioner responds that the ALJ expressly cited and appropriately considered the relevant factors. (Comm'r's Mem. in Supp. at 11-13.) The Commissioner asserts that the ALJ pointed to the fact that the objective medical evidence did not support Plaintiff's allegations and testimony that he had difficulty walking; Plaintiff's work activities both historically and recently did not support the allegation that Plaintiff quit working on account of his impairments; and Plaintiff's limited daily activities were not objectively verifiable, not attributable to medical evidence, and not as limited as would be expected. (Comm'r's Mem. in Supp. at 12-13.) The Commissioner acknowledges that the ALJ did not consider Plaintiff's alleged side effects from his medications. (Comm'r's Mem. in Supp. at 13.)

On more than one occasion, the ALJ noted that Plaintiff's allegations of pain and limited mobility were not supported by objective medical treatment. (*See* Tr. 17-18.) "It is error for an ALJ to disbelieve a claimant's testimony *merely* because there are no

medical reports to provide an objective basis for the subjective report of pain."
*Eichelberger*, 390 F.3d at 589 (emphasis added); *accord* 20 C.F.R. §§ 404.1529(c)(2)
("However, we will not reject your statements about the intensity and persistence of your
pain or other symptoms or about the effect your symptoms have on your ability to work
*solely* because the available objective medical evidence does not substantiate your
statements." (emphasis added)), 416.929(c)(2) (same). Nevertheless, "statements about
[a claimant's] pain or other symptoms will not alone establish that [a claimant] is
disabled." 20 C.F.R. § 404.1529(a); *accord* 20 C.F.R. § 416.929(a) (same).

> There must be medical signs and laboratory findings which
> show that [the claimant] ha[s] a medical impairment(s) which
> could reasonably be expected to produce the pain or other
> symptoms alleged and which, *when considered with all of the
> other evidence* (including statements about the intensity and
> persistence of [the claimant's] pain or other symptoms which
> may reasonably be accepted as consistent with the medical
> signs and laboratory findings), would lead to a conclusion
> that [the claimant] is disabled.

20 C.F.R. § 404.1529(a) (emphasis added); accord 20 C.F.R. § 416.929(a) (same).

Here, "the lack of corroborating evidence was just one of the factors the ALJ
considered." *Goff*, 421 F.3d at 792; *see Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir.
2011) (objective medical evidence a factor to consider in assessing subjective
complaints). As the Commissioner points out, the ALJ focused on Plaintiff's work
activities. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (work history to be
taken into account when evaluating credibility). Plaintiff stopped working because he
was laid off, not because of his impairments. "Courts have found it relevant to credibility
when a claimant leaves work for reasons other than [his] medical condition." *Id.* at 793.

After he was laid off, Plaintiff received unemployment benefits and continued to look for work. *See Johnson v. Charter*, 108 F.3d 178, 180-81 (8th Cir. 1997) ("Applying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability." (quotation omitted)); *see also Whitman v. Colvin*, 762 F.3d 701, 708 (8th Cir. 2014). The ALJ noted that Plaintiff's "poor long-term work history greatly undermines his allegations he is now medically disabled from full-time employment." *See Buckner*, 646 F.3d at 558 (sporadic work history prior to alleged onset date undermined claimant's credibility).

The ALJ also considered Plaintiff's "fairly limited" daily activities, but concluded that "two factors weigh against considering these allegations to be strong evidence in favor of finding [Plaintiff] disabled." (Tr. 19.) "First, [Plaintiff's] allegedly limited activities cannot be objectively verified with any reasonable degree of certainty." (Tr. 19.) "Second[], even if [Plaintiff's] activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Plaintiff's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." (Tr. 19.)

The ALJ also noted that these limited activities were "fully consistent with, and likely in excess of, the residual functional capacity." (Tr. 19.) The ALJ found that Plaintiff was able to do sedentary work with some additional restrictions. "[A] sedentary job is defined as one which involves sitting, [and may be accompanied by] a certain amount of walking and standing . . . necessary in carrying out job duties." 20 C.F.R. § 404.1567(a); *accord* 20 C.F.R. § 416.967(a) (same). The limited activities identified by

Plaintiff generally involved a substantial amount of sitting. *See Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) ("Ellis testified that he spent his time reading and watching television, which is contrary to his assertion that he could sit only for a limited time."). Further, prior to being laid off, Plaintiff was working full-time in a position that primarily involved sitting with some breaks and the record does not show a significant deterioration in his condition since that time. *See Goff*, 421 F.3d at 792 ("The fact that Goff worked with the impairments for over three years after her strokes, coupled with the absence of evidence of significant deterioration in her condition, demonstrates the impairments are not disabling in the present.").

True, the ALJ did not expressly discuss the side effects Plaintiff allegedly experienced from his medications. But, the ALJ was not required to do so. *Buckner*, 646 F.3d at 558 (no error in failing to discuss side effects from claimant's medications in determining claimant's credibility when other factors were considered); *see Goff*, 421 F.3d at 791; *Eichelberger*, 390 F.3d at 590. Moreover, although Plaintiff reported side effects of dizziness, drowsiness, blurred vision, and an upset stomach in his Disability Reports (Tr. 177, 196), the record is extremely sparse that Plaintiff experienced such side effects at all. *See McCoy*, 648 F.3d at 615 ("We review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation."). While Dr. Davis stated that Plaintiff's medications caused dizziness, drowsiness, and decreased alertness, the medical records do not indicate that Plaintiff complained of such side effects to Dr. Davis. Further, while the medical records show that Plaintiff told Dr. Harbst that he felt

"sluggish" on cyclobenzaprine, (Tr. 430), the only other documented complaints were blurry vision and weight gain with Lyrica and sexual dysfunction with gabapentin, (Tr. 431, 446).

The Court agrees with Plaintiff that the ALJ mischaracterized Plaintiff's candidacy for surgery, implying that Plaintiff's impairments were not severe enough to require surgery rather than that surgery was not likely to be beneficial to Plaintiff. (*See* Tr. 18.) This does not, however, undermine the ALJ's credibility analysis when considering the factors the ALJ did discuss.

Courts "defer to the ALJ's credibility finding if the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Buckner*, 646 F.3d at 558 (quotation omitted). "[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." *Eichelberger*, 390 F.3d at 589; *accord Goff*, 421 F.3d at 792 (subjective complaints may be discounted when inconsistent with the record as a whole); *see Perks*, 687 F.3d at 1093 (testimony properly discounted when "inconsistent with the record"). "[I]t is the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant." *Eichelberger*, 390 F.3d at 589-90 (quotation omitted). While the ALJ could have gone through each of the relevant factors more methodically, "substantial evidence exists in the record to support the ALJ's adverse credibility finding" given the "deferential standard of review." *Whitman*, 762 F.3d at 708.

## 2. Dr. Davis

Lastly, Plaintiff argues that the ALJ erred by not giving treating physician Dr. Davis's opinion controlling weight regarding Plaintiff's symptoms impairing his ability to maintain sufficient concentration to perform simple work-related tasks; need for a job that allows him to shift at will from sitting, standing, or walking; and the need for additional, unscheduled breaks every hour. (Pl.'s Mem. in Supp. at 4-5.) Plaintiff also argues that Dr. Davis's opinion that Plaintiff's prognosis is "poor" coupled with his notes that Plaintiff will have to rely on non-operative measures for pain management demonstrate that Plaintiff will continue to suffer from disabling pain. (See Pl.'s Mem. in Supp. at 5-6.)

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence." *Goff*, 421 F.3d at 790 (quotation omitted); *accord* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014). "Yet[, this "controlling weight"] is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *accord Bernard*, 774 F.3d at 487 ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). "The [C]ommissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such

opinions." *Cline*, 771 F.3d at 1103 (quotation omitted); *see Bernard*, 774 F.3d at 487

("An ALJ may also give less weight to a conclusory or inconsistent opinion by a treating

physician."). "Whether granting a treating physician's opinion substantial or little

weight, the [C]ommissioner must always give good reasons for the weight she gives."

*Cline*, 771 F.3d at 1103 (quotation omitted).

The ALJ found that Dr. Davis's opinion that Plaintiff needed unscheduled breaks

every hour and would have to miss work three or four days per month "wildly at odds

with the minimal clinical objective findings and signs described in the treatment record."

(Tr. 20.) The ALJ concluded that "Dr. Davis apparently relied quite heavily on the

subjective report of symptoms and limitations provided by [Plaintiff], and seemed to

uncritically accept as true most, if not all, of what [Plaintiff] reported." (Tr. 20.)

Here, the ALJ observed the Dr. Davis's opinion was inconsistent with the medical

records. (Tr. 20.) The ALJ noted that Plaintiff's back surgery was largely successful.

And, around the time of Dr. Davis's opinion, other treatment providers observed that

Plaintiff had a non-antalgic gait; no pain and full range of motion in his right hip despite

having moderate to advanced degenerative arthritis; a straight back and normal flexion;

and experienced some improvement from an epidural steroid injection, a procedure which

Plaintiff subsequently repeated. The Court agrees with the Commissioner that "the

objective evidence obtained immediately prior to [and around the time of] Dr. Davis

issuing his opinion did not support Dr. Davis'[s] opinion regarding the frequency of

breaks and absences Plaintiff would require." (Comm'r's Mem. in Supp. at 9.) Further,

around the same time, Plaintiff reported to treatment providers that he had been siting for

two hours at a time followed by a ten-minute break for eight hours per day at his job. "An ALJ may reject a treating physician's opinion if it is inconsistent with the record as a whole." *McCoy*, 648 F.3d at 616; *see* 20 C.F.R. §§ 404.1527(c)(2)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."), 416.927(c)(4) (same). In addition, for the reasons stated above, the ALJ properly concluded that Plaintiff was not wholly credible. An ALJ does not err in discounting a treating physician's opinion when that opinion appears to be based on a claimant's self-reported symptoms which are not wholly credible. *McCoy*, 648 F.3d at 617.

Plaintiff argues that Dr. Davis's opinion, along with Dr. Davis's notes and the notes of Dr. Harbst, demonstrate that he "would continue to experience back pain with severe symptoms." (Pl.'s Mem. in Supp. at 5; *see* Pl.'s Mem. in Supp. at 6.) The question is not, however, whether Plaintiff is in fact in pain. "As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." *Perkins*, 648 F.3d at 901 (quotations omitted). The notes of Drs. Davis and Harbst indicating that Plaintiff will have to rely on non-surgical measures to manage his pain in the future support the existence of Plaintiff's pain, but they do not compel the conclusion that the pain is so severe that Plaintiff is precluded from engaging in any form of substantial gainful activity when considering the record as a whole. *See id.* ("While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability. (quotation omitted)). The ALJ did not outright reject

Plaintiff's complaints of pain and specifically indicated that Plaintiff was restricted to simple work, involving routine tasks with no strict production quotas, "due to pain." (Tr. 16.)

In sum, the Court concludes that the ALJ did not err in concluding that Dr. Davis's opinion was not entitled to controlling weight.

## VII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED** and Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**.

Dated: July  30  , 2015               _s/ Tony N. Leung_
                                       Tony N. Leung
                                       United States Magistrate Judge
                                       for the District of Minnesota

                                       *Evans v. Colvin*
                                       Case No. 14-cv-1011 (JRT/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.